**ADVANCED DATA CONCEPTS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 98–495C.

United States Court of Federal Claims.

April 14, 1999.

Cyrus E. Phillips, IV, Washington, D.C., for plaintiff, Christopher H. Jensen, of counsel.

Tonya J. Williams, Washington, D.C., with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, and Assistant Director James M. Kinsella, for defendant.

### Opinion and Order[1]

WEINSTEIN, Judge.

This post-award bid protest case, brought pursuant to the court's recently expanded jurisdiction under 28 U.S.C. § 1491(b)(1) (1994 & Supp.1998), section 12 of the Administrative Dispute Resolution Act of 1996 (ADRA), Pub.L. No. 104–320, 110 Stat. 3870, 3874–75, is before the court on cross-motions for summary judgment on the administrative record.

On June 11, 1998, plaintiff moved for a preliminary injunction. During a June 17, 1998, hearing, the parties indicated that they had negotiated an agreement whereby: (1) plaintiff withdrew its application for preliminary injunction; (2) defendant, at its discretion, would begin performance under the protested contract; and (3) plaintiff had the option (if the court sustained the protest) to compete in any re-solicitation of the contract.

On June 11, 1998, plaintiff filed a motion for entry of a protective order, which the court granted on June 12, 1998. On June 18, 1998, the court adopted the protective order proposed by plaintiff.

Upon reviewing the administrative record

---

1. This opinion was originally filed on March 18, 1999, subject to a protective order. The parties were directed to designate protected material in the opinion that should be redacted. The opinion now issued for publication redacts all the material designated by asterisks within brackets ( [* *] ).

(AR)[2] and the parties' briefs,[3] the court concludes that plaintiff's claims[4] do not merit relief. Accordingly, for the reasons discussed below, plaintiff's motion for summary judgment is denied and defendant's motion for summary judgment is granted.[5]

### Facts

The relevant facts set forth below, which are taken from the AR, are not in dispute.

DOE issued Solicitation No. DE–RP01–97NN50008 on April 1, 1997. The procurement was to be a negotiated, not a sealed bid, procurement. AR at 81. The solicitation sought proposals for the on-site delivery of specialized technical, analytical, and administrative support services at DOE's Office of Declassification in Germantown, MD. AR at 5. DOE's Office of Declassification manages procedures for identifying classified information and certain unclassified, but sensitive, information within DOE's jurisdiction. The office supports the federal government's non-proliferation objectives by shaping classification policies to inhibit the spread of nuclear technology. AR at 13.

The solicitation identified the contract period as two years, with three one-year options. AR at 5–9. It required the contractor to provide support services, totaling 62,000 direct productive labor hours (DPLH) per year, under ten different labor categories. AR at 119. Direct productive labor hours were defined as "actual work hours exclusive of vacation, holiday, sick leave, and other absences." AR at 37. Of the ten labor categories, four were designated as "key personnel": project manager, senior policy analyst, senior technical analyst, and senior training specialist. AR at 27. The solicitation required the contractor to provide the names and resumes of these "key personnel." AR at 88.

The relative weights for technical criteria were as follows:

| Criterion | Weight in Points |
|---|---|
| (1) personnel qualifications and availability | (333, or 33.3% of the total) |
| (a) availability of personnel | 133 |
| (b) key personnel qualifications | 200· |
| (2) technical approach | (317, or 31.7% of the total) |
| (a) technical approach | 200 |
| (b) understanding of statement of work | 117 |
| (3) past performance | (250, or 25% of the total) |
| (a) quality | 50 |

2. A supplemental administrative record was filed on August 5, 1998, and the motions for summary judgment shortly thereafter. The parties subsequently filed redacted copies of these motions.

3. DynCorp EENSP, Inc. d/b/a DynMeridian (DynMeridian), the incumbent and successful bidder, moved to intervene in this action. The court denied DynMeridian's motion and permitted DynMeridian's participation in this action as *amicus curiae. See Advanced Data Concepts, Inc. v. United States*, No. 98–495C (Fed.Cl. June 18, 1998).

4. Plaintiff's complaint raises ten claims for relief, each of which is addressed herein, albeit rearranged into different categories: (1) the Department of Energy (DOE) failed to rate plaintiff's proposal on the "availability of personnel" and "key personnel" subcriteria in accordance with the weighting announced in the solicitation; (2) DOE double-counted a weakness in plaintiff's proposal by rating both key and non-key personnel as "classification professionals;" (3) DOE failed to contemporaneously evaluate the effect of DynMeridian's offer of uncompensated over-time; (4) DOE failed to contemporaneously assess the strengths and weaknesses of DynMeridian's proposal; (5) DOE improperly conducted an *ad hoc* evaluation of plaintiff's past performance; (6) DOE failed to assess plaintiff's past performance under the statutory and regulatory framework for collecting such information; (7) DOE failed to afford plaintiff meaningful discussions; (8) DOE failed to properly assess plaintiff's proposal when it did not notice that plaintiff had eliminated references to critical weapon design information; (9) DOE failed to contemporaneously document the technical evaluation, the source selection decision, and the procurement transaction; and (10) DOE breached its implied-in-fact contract to fairly evaluate plaintiff's proposal.

5. The court has overlooked plaintiff's use of an extremely fine typeface (Garmond) and single spacing, apparently intended to sidestep the court's page limitation of 40 pages. *See* Rule 83.1(b) of the Rules of the United States Court of Court of Federal Claims (RCFC).

| | |
|---|---|
| (b) cost control | 50 |
| (c) timeliness of performance | 50 |
| (d) business relations | 50 |
| (e) customer satisfaction | 50 |
| (4) organization and management capabilities | (100, or 10% of the total) |
| (a) management planning and control | 50 |
| (b) organization structure | 25 |
| (c) corporate resources | 25 |
| *Total* | 1000 points |

AR at 159.

The solicitation stated that the "[a]ward will be made to th[e] responsible offeror(s), whose offer(s), conforming to th[e] RFP is (are) considered most advantageous to the Government." AR at 108. In determining advantage, the "technical proposal [was] of greater importance than the cost proposal." AR at 108. The solicitation required a determination of whether the best technical proposal was worth the cost differential. AR at 108.

The third criterion of the solicitation called for the evaluation of bidders' past performance. It required the use of a specific form (a "Contractor Performance Report") to collect past performance information. AR at 87, 122–23. The solicitation also stated that "if an offeror's client is unwilling to provide to the Government requested information in support of the Government's past performance evaluation, that experience will be given a neutral rating." AR at 90. The solicitation did not define a "neutral" rating.

The solicitation contained the clause at Federal Acquisition Regulation (FAR)[6] § 52.215–16, which required, *inter alia*, DOE to conduct discussions with all offerors "whose proposals have been determined to be within the competitive range." AR at 81. Discussions were to be held after the competitive range determination. The final award was to be based on bidders' best and final offers (BAFOs). AR at 81.

DOE received four proposals. Plaintiff's was submitted on April 30, 1997. AR at 1550. Its oral presentation took place on

June 17, 1997. AR at 1567–1686. DOE's technical evaluators scored the initial proposals on June 23, 1997. AR at 116. The technical evaluators noted, *inter alia*, the following weaknesses in plaintiff's proposal: (1) "Appeared to be oriented to a large project management approach as opposed to integrated day-to-day support;" (2) "Continual confusion of classification with security. 'Ensure limited access to CNWDI [Critical Nuclear Weapon Design Information]' as a stated and emphasized objective—which is not a classification matter;" and (3) "Fails to understand the difference between Critical Information and Technology (CRIT) and restricted data under NISPOM." AR at 182–85. No competitive range determination was made.

On July 31, 1997, without conducting discussions, DOE awarded the contract to Dyn-Meridian. AR at 195. On August 12, 1997, at plaintiff's request, DOE debriefed plaintiff. DOE informed plaintiff that its proposed "key personnel qualifications" were rated as poor because, *inter alia*, the personnel lacked nuclear weapons design, development, or testing experience. AR at 197–213.

Plaintiff filed a protest with the General Accounting Office (GAO) on August 15, 1997, arguing primarily that DOE unlawfully awarded the contract without holding discussions, as required by the solicitation. AR at 2012–23. In response, DOE rescinded the award and reopened the procurement. DOE agreed to determine a competitive range of offerors, to open discussions on written questions, and to receive and evaluate BAFOs upon conclusion of the discussions. AR at

6. The FAR is codified at title 48 of the Code of Federal Regulations. Section references are to the provisions of title 48 effective when the solicitation was issued on April 1, 1997.

2361. On September 16, 1997, the GAO dismissed plaintiff's protest as moot because DOE had taken adequate corrective action. AR at 2371.

On September 18, 1997, DOE made a competitive range determination that included plaintiff, DynMeridian, and Science Applications International Corp. (SAIC). AR at 214. DOE issued written technical and cost questions and amended the solicitation on October 29, 1997. AR at 226. The amendment required that all "key personnel" have experience with nuclear weapons, production reactors, nuclear weapons safeguards and security, or special nuclear materials. AR at 153. (Prior to the amendment, only the senior technical analyst needed such experience. AR at 114.)

Plaintiff submitted a revised technical proposal and BAFO, replacing some of its key personnel, on November 17, 1997. AR at 1801. DynMeridian's BAFO proposed uncompensated overtime for some of its employees. AR at 1353–55.

On November 26, 1997, the DOE technical evaluators scored the revised proposals as follows:

| Offeror | Price [7] | Proposal Score |
|---|---|---|
| DynMeridian | $15,881,789 | 970 |
| ADC | $12,645,332 | 644.9 |
| SAIC | [*********] | [****] |

AR at 239, 249–66.

The Source Selection Official (SSO) awarded the contract to DynMeridian on January 30, 1998, AR at 267, concluding that DynMeridian's "vastly superior technical approach and quality of the technical personnel proposed," more than justified the $3,236,457 (approximately 25%) price differential. AR at 269. The agency found that DynMeridian's proposal gave the best overall value to, and thus was in the best interests of, the government. AR at 269.

Plaintiff received a debriefing on February 5, 1998, AR at 197–204, and filed a second protest with the GAO on February 6, 1998. AR at 2012–23. Plaintiff claimed, *inter alia,* that DOE: (1) failed to provide meaningful discussions, (2) unlawfully evaluated classification experience, and (3) exhibited bias in

favor of the incumbent contractor. In a February 23, 1998, supplemental protest, plaintiff claimed, *inter alia,* that DOE unlawfully failed to consider DynMeridian's offer of uncompensated overtime until February 18, 1998, in the price negotiation memorandum, *i.e.,* after the contract was awarded. AR at 2124–34.

On March 17, 1998, after reviewing plaintiff's protest, DOE prepared a supplemental source selection statement that corrected an error in the rating plan. AR at 2006. The SSO concluded that the change would not alter his decision. AR at 2006. The SSO also stated that he had in fact considered DynMeridian's offer of uncompensated overtime but, nevertheless, concluded that this offer "would not affect DynMeridian's technical capabilities to perform the contract requirements." AR at 2007.

The GAO denied plaintiff's protest on June 1, 1998. AR at 2331. Although it rejected most of plaintiff's claims, the GAO determined that DOE unlawfully scored the "personnel qualifications and availability" criterion by reversing the relative weights of two subcriteria announced in the solicitation: "availability of personnel" and "key personnel qualifications." AR at 2333–35. The GAO also concluded that, under the "availability of personnel" subcriterion, DOE unlawfully evaluated classification experience. AR at 2335–37. Nevertheless, the GAO denied plaintiff's protest because plaintiff was unable to show that these two DOE errors were prejudicial. AR at 2344.

### Summary Judgment

Summary judgment is appropriate when the court finds both that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Motions for judgment on the administrative record are evaluated under the same standards as motions for summary judgment pursuant to RCFC 56(a). *See* RCFC 56.1(a). Because there are no disputed issues of material fact,

---

7. Plaintiff's initial proposal was for $9,495,000. DynMeridian's was for $17,183,793. AR at 196.

the court must determine whether either party is entitled to judgment as a matter of law. *See* RCFC 56.

Summary judgment is not a disfavored means of resolving disputes; on the contrary, it is an "integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1); *see also Avia Group Int'l, Inc. v. L.A. Gear California, Inc.,* 853 F.2d 1557, 1560 (Fed.Cir.1988); *Sweats Fashions, Inc. v. Pannill Knitting Co.,* 833 F.2d 1560, 1562 (Fed.Cir.1987). The fact that both parties have moved for summary judgment, however, does not relieve the court of its responsibility to determine the appropriateness of summary disposition. *See Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988).

### Post–Award Bid Protests

In post-award bid protests brought pursuant to the new Tucker Act jurisdiction,[8] courts must apply the standard of review for agency action established by the Administrative Procedure Act, 5 U.S.C. § 706 (1994). *See* 28 U.S.C. § 1491(b)(4). An agency procurement decision, like the SSO's in this case, will be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In cases, as here, where the GAO has rendered a decision, it is the agency's decision, not the GAO's, that is the subject of judicial review. Nevertheless, the court must give deference to the GAO's decision. *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir. 1989). The scope of review is confined to the administrative record, *i.e.,* to the record before the decision maker when the final award

decision was made. *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The court "may award any relief that [it] considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).

■ Courts allow agencies broad discretion in conducting negotiated procurements and determining which bid is most advantageous to the government. *See Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 958–59 (Fed.Cir.1993); FAR § 15.605(b). If the agency's decision is reasonable, the court will not disturb it. *See, e.g., Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 995–96 (Fed.Cir.1996). To receive injunctive relief, plaintiff must show, not only that the agency's decision is unreasonable, but also: 1) that failure to enjoin the procurement will cause irreparable harm; 2) that such harm outweighs any potential harm to third parties; and 3) that injunctive relief is in the public interest. *See FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993).

■ Moreover, absent any evidence of actual irregularity, the court presumes the regularity of government action. *See Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976) (holding that government officials are presumed to act in good faith). To rebut this presumption, a plaintiff must present "well-nigh irrefragable proof" that the government acted in bad faith. *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, 771 (1982). In sum, a court may set aside an agency's action only when it has no rational basis, *see M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1306 (D.C.Cir.1971), *i.e.,* when the decision is "totally lacking in reason." *Keco Indus. Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200, 1206 (1974).

8. 28 U.S.C. § 1491(b)(1) provides:

Both the Unites [sic] States Court of Federal Claims and the district courts of the United States shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement. Both the United States Court of Federal Claims and the district courts of the United States shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

The Competition in Contracting Act of 1984, Pub.L. No. 98–369, 98 Stat. 1175, requires agencies to "evaluate sealed bids and competitive proposals, and award a contract, based solely on the factors specified in the solicitation." 41 U.S.C. § 253b(a). The FAR also requires proposals to be evaluated "solely on the factors specified in the solicitation." FAR § 15.608(a). An agency's failure to comply with the terms of the solicitation may constitute grounds for overturning the bid award. *See Keco Indus.*, 492 F.2d at 1203–04.

Not every error requires rejection of the agency's action. *See SMS Data Prods. Group, Inc. v. United States*, 900 F.2d 1553, 1557 (Fed.Cir.1990); *Excavation Constr., Inc. v. United States*, 204 Ct.Cl. 299, 494 F.2d 1289, 1293 (1974). The court will not overturn a contract award based on *de minimis* errors made during the procurement process. *See Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1048 (Fed. Cir.1994) ("overturning awards on *de minimis* errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations") (quoting *Andersen Consulting Co. v. United States*, 959 F.2d 929, 932 (Fed.Cir. 1992)).

In addition, a protester must show, not only an error in the procurement process, but also that the error was prejudicial. *See Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996); *Central Ark., Maintenance, Inc. v. United States*, 68 F.3d 1338, 1342 (Fed.Cir.1995). To establish prejudice, the protester must show that, but for the procurement error, there was a "substantial chance that [it] would receive an award." *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir.1996) (quoting *CACI, Inc. v. United States*, 719 F.2d 1567, 1574–75 (Fed. Cir.1983)).

### *"Availability of Personnel" and "Key Personnel"*

Plaintiff claims that defendant's weighting of the "availability of personnel" and "key personnel qualifications" subcriteria under the solicitation's "personnel" criterion was unlawful under 41 U.S.C. § 253a(b)(1)(B) (1994) (requiring agencies to follow the relative weighting set forth in the solicitation). Plaintiff correctly points out that the rating plan and the solicitation contained different weights for these subcriteria. The *solicitation* provided that "availability of personnel" was given "approximately twice the weight" of "key personnel qualifications." AR at 110. The *rating plan*, which was used by the technical evaluators, but not provided to bidders, conversely gave "availability of personnel" a weight of 133 and "key personnel qualifications" a weight of 200. AR at 159. In scoring the proposals, DOE used the weights in the rating plan, rather than the solicitation. AR at 2006.

Defendant concedes that DOE incorrectly used the weights set forth in the rating plan, rather than the solicitation, but contends that the error is *de minimis*, and as such is insufficient in and of itself to overturn a contract award; the protester also must show prejudice.

The facts here do not support plaintiff's claim that it was prejudiced by DOE's scoring error. Even correcting the personnel weightings as requested by plaintiff would have raised plaintiff's score only from 644.9 to 665 and left DynMeridian's score unchanged at 970. AR at 2006. This made DynMeridian's technical score 46% higher than plaintiff's (clearly surpassing plaintiff's 26% cost advantage).

Plaintiff argues that it should have received an even greater increase, of 26.7 points. It states that, to correct the error in the solicitation, the SSO:

> reverse[d] the weights used in the weighting plan, "13.3," and "20." . . . . In fact, the solicitation announced that the Availability of Personnel Subcriterion was "weighted *approximately twice* the weight of" the Key Personnel Qualifications Subcriterion. To correct the scoring to conform to the weights announced in the solicitation, it is necessary to use weights of "11.1" and "22.2."

Plaintiff's Motion for Summary Judgment upon the Administrative Record (Pl.Br.) at 21 (emphasis added).

Plaintiff's argument fails because even an increase of 26.7 points would not have converted plaintiff's bid into the best overall bid. An increase of 26.7 points would have raised plaintiff's score only from 644.9 to 671.6, but would leave DynMeridian's score at 44% higher, clearly surpassing plaintiff's 26% cost advantage. There is therefore no prejudice. The GAO agreed, stating that "[t]his more accurate adjustment would have an immaterial effect on ADC's corrected score." AR at 2334.

Plaintiff submitted an affidavit from ADC President James A. Rivera stating, "Had we known that in fact the 'key personnel qualifications' subfactor was twice the weight of the 'personnel qualifications and availability' subfactor, we would have submitted a different set of key personnel." AR at 2147–48. This does not demonstrate prejudice. Defendant's solution to the scoring error was to adjust the weights to those set forth in the solicitation. Because plaintiff submitted its bid in contemplation of that weighting scheme, it cannot claim here that it would have submitted a different proposal.

In sum, the SSO considered the corrected scoring and found that DynMeridian's proposal still provided the best overall value to the government. AR at 2006–07.

### Classification Experience

■■■ Plaintiff also asserts that DOE unlawfully evaluated classification experience. It argues that the solicitation required classification experience under the "key personnel qualifications" subcriterion, but not under the "availability of personnel subcriterion" and challenges DOE's rating of classification experience under both subcriteria.

In this instance, too, defendant concedes, as the GAO found, that the agency improperly evaluated classification experience under the "availability of personnel" subcriterion. Defendant has stated: "While DOE does not agree ... that DOE did not adequately in-

form offerors that the classification experience of non-key personnel would be evaluated, .... the Government recognizes that the GAO['s finding] is entitled to substantial deference." Defendant's Motion for Summary Judgment on the Basis of the Administrative Record (Def.Br.) at 15 n. 7.

Plaintiff, however, has not shown that such an improper evaluation was prejudicial. *See Data Gen.,* 78 F.3d at 1562 (error did not prejudice plaintiff because plaintiff failed to show that, without the error, there was a reasonable likelihood of success). Even assuming that plaintiff received a perfect score under the "availability of personnel" subcriterion—that is, a "10"—plaintiff's total score would have risen from 671.6 (correcting for the earlier discussed error) to 711.6 only. DynMeridian's score of 970 would still be 36% higher than plaintiff's, still substantially outweighing plaintiff's 26% cost advantage. Moreover, technical factors were significantly more important than price in this procurement. AR at 108. Thus, DOE's decision to award the contract to DynMeridian clearly was reasonable.

### Uncompensated Overtime[9]

Plaintiff's contentions that DOE unlawfully failed to consider DynMeridian's offer of uncompensated overtime, and that FAR § 37.115–2(a) precludes the use of uncompensated overtime, are without merit. FAR § 37.115–2(a) is inapplicable, as it did not become effective until August 22, 1997, four months after the solicitation was issued. In addition, the solicitation adopted a neutral stance toward uncompensated overtime, see AR at 101 (DOE "does not encourage or discourage the use of uncompensated overtime as a bidding method for DOE's request for proposals"), even though the solicitation cautioned that "lowered compensation for essentially the same professional work *may* indicate lack of sound management judgment and lack of understanding of the requirement." AR at 111 (emphasis added).

---

9. "Uncompensated overtime" refers to work in excess of 40 hours per week performed by employees exempt from the Fair Labor Standards Act, 29 U.S.C. §§ 201–209, and the Service Contract Act, 41 U.S.C. §§ 351–358. High levels of uncompensated overtime can reduce the quality of the services rendered. *See* 10 U.S.C. § 2331(b)(6) (requiring the Secretary of Defense to "provide guidance to contracting officers to ensure that any use of uncompensated overtime will not degrade the level of technical expertise required to perform the contract").

Thus, the solicitation allowed DOE to consider uncompensated overtime as an asset, as a liability, or not at all. Plaintiff points to no contractual or other legal requirement that DOE consider offers of uncompensated overtime in its technical evaluations.

Plaintiff claims that GAO precedent [10] requires agencies to consider the possible adverse effect of uncompensated overtime in their technical evaluations. In its motion for summary judgment, plaintiff cites *Combat Systems Development Associates Joint Venture*, B–259920.2, June 13, 1995, 95–2 CPD ¶ 162, for the proposition that "the possible adverse effect of [an offer of uncompensated overtime must be] reflected in the evaluation, as required by FAR § 15.608(a)(1)." Pl.Br. at 29 (purportedly quoting *Combat Sys. Dev. Assocs. Joint Venture*, B–259920.2, June 13, 1995, 95–2 CPD ¶ 162, at 10).

Plaintiff's "re-wording" of the bracketed material, however, does not reflect *Combat Systems'* express holding. The passage actually states:

> With respect to CSDA's contention that the Navy should not have accepted Vitro's *pay and benefits cuts*, we note first that the evaluation record shows that the Navy expressly considered Vitro's proposed *pay and benefits cuts* and ensured that the possible adverse effect of the cuts was reflected in the evaluation, as required by FAR § 15.608(a)(1).

*Combat Sys. Dev. Assocs. Joint Venture*, B–259920.2, June 13, 1995, 95–2 CPD ¶ 162, at 10 (emphasis added). This passage deals, not with uncompensated overtime, as plaintiff would characterize the holding, but instead with a contractor's proposal to cut salary and benefits immediately after the contract award. No language in this passage, or anywhere else in the case, approves, or refers to, a *per se* requirement to consider uncompensated overtime, or to give it a negative effect.

In any event, the SSO *did* evaluate DynMeridian's offer of uncompensated overtime at the time he made the award decision, but concluded that the small amount offered (

[***] ) would not affect DynMeridian's ability to perform the contract. AR at 2007. The contracting officer concurred with this assessment. AR at 251.

### Post Hoc Rationalizations

Plaintiff characterizes the supplemental source selection statement, AR at 2006, and the contracting officer's price negotiation memorandum, AR at 249, as unlawful, *post hoc* rationalizations for agency action. *See Overton Park*, 401 U.S. at 419, 91 S.Ct. 814 (because APA review is confined to the "whole record" before the agency at the time the agency made its decision, 5 U.S.C. § 706, courts normally will not consider *post hoc* rationalizations). This is incorrect.

The supplemental source selection statement and the price negotiation memorandum are not *post hoc* rationales, but rather are elements of the agency's original action. These statements merely provide additional detail concerning the agency's pre-existing rationale for its decision and may be considered by this court. *See Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir.1989) (extra-record evidence is permissible where an agency considered evidence which it failed to include in the record). Plaintiff offers no evidence to the contrary. Accordingly, these statements are not impermissible *post hoc* rationales.

### Personnel Requirements

Plaintiff asserts a new claim, not raised in its complaint, that the DOE–DynMeridian contract unlawfully modifies the solicitation's stated personnel requirements. Plaintiff argues that the solicitation required the on-site delivery of 31 full-time employees at the rate of 2,000 DPLH per person per year. Plaintiff claims that the DOE–DynMeridian contract provides:

> for the delivery of services from [***] personnel on-site at DOE's Office of Declassification at the rate of [***] [DPLH] per person per year, for the delivery of services from [***] non-key personnel on-site at DOE's Office of Declassification at the

---

**10.** GAO precedent is not binding on this court although it may, in appropriate cases, be persua-

sive. *See Honeywell*, 870 F.2d at 647–48.

rate of 2,000 [DPLH] per person per year, and for the delivery of services from [***] non-key personnel at the following percentages of the required 2,000 [DPLH] per person per year: [***]

Pl.Br. at 27. Plaintiff claims that the DOE–DynMeridian contract calls for the services of only [***] full-time employees, [***] fewer than required by the solicitation, and thus that the awarded contract impermissibly varies the solicitation's requirements.

Plaintiff's claim is contradicted by the record. Exhibit B1 to DynMeridian's BAFO lists the proposed DPLH for all of DynMeridian's personnel. [***] full-time employees provide 2,000 DPLH per year. AR at 1300. [***], AR at 1300, [***], AR at 1306, supply the balance of the required DPLH. Nevertheless, DynMeridian's BAFO still [***] than 31 full-time on-site employees.

Defendant argues that the solicitation did not require 31 full-time employees but rather, allowed bidders to determine how to allocate the required 62,000 DPLH among their employees. Instead of providing 31 full-time employees at 2,000 DPLH each, DynMeridian allocated the hours among [***] (providing a total of [***] DPLH), with [***] and [***] the remaining required hours. AR at 1300–10.

For example, for its "key personnel" (project manager, senior policy analyst, senior technical analyst, and senior training specialist), DynMeridian proposed [***] each. AR at 1300. To satisfy the solicitation's requirement of 14,000 DPLH for the technical analyst position, DynMeridian proposed [***] DPLH. AR at 1300, 1318. To satisfy the solicitation's requirement of 6,000 DPLH for the policy analyst position, DynMeridian proposed [***]. AR at 1300, 1318. For the contract's base year, DynMeridian's bid stated that DynMeridian employees would provide a total of [***] DPLH and that [***] would provide a total of [***] DPLH. These hours total 62,000 DPLH. AR at 1312, 1318. The total DPLH for each personnel category satisfies the minimum number of employees required for each category.

■ If the parties dispute a contract's meaning, the court employs the following analysis. First, the court considers the plain language of the contract. *Northrop Grumman Corp. v. Goldin,* 136 F.3d 1479, 1483 (Fed.Cir.1998); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991). The court must give reasonable meaning to all parts of the contract, and not render any portion meaningless. *Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir. 1985); *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 591 F.2d 629, 633 (1979).

■ Next, the court determines whether the language, given its ordinary meaning, creates an ambiguity. *See McAbee Constr. v. United States,* 97 F.3d 1431, 1434–35 (Fed. Cir.1996). "A contract is ambiguous if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language." *Community Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1579 (Fed.Cir.1993) (citations omitted). If a contract term is unambiguous, the court cannot assign it another meaning, no matter how reasonable it may appear. *Triax Pacific, Inc. v. West,* 130 F.3d 1469, 1473 (Fed.Cir.1997) (citing *R.B. Wright Constr. Co. v. United States,* 919 F.2d 1569, 1572–73 (Fed.Cir.1990)).

■ Attachment 3 to the solicitation may be read as requiring that the 62,000 DPLH be provided by 31 employees. AR at 119. That is because attachment 3 indicated the number of employees (in parenthesis) for each labor category, as follows: "Project Manager," "Senior Policy Analyst," "Policy Analyst (3)," "Document Reviewer," "Senior Technical Analyst," "Technical Analyst (7)," "Senior Training Specialist," "Training Specialist," "Training Assistant," and "Clerical Support (14)." Adding the number of employees specified for each category registers a total of 31 employees.

However, nothing in the solicitation prohibited the use of part-time employees, as plaintiff's argument suggests. Absent any express prohibition of part-time labor, attachment 3 is best construed as delineating a minimum, not exact, number of employees. This reading gives meaning to all provisions of the contract, and accommodates both possible readings of the contract.

Moreover, other portions of the solicitation merely required offerors to bid 62,000 DPLH and did not set out a specific number of full-time employees. For example, section B of the solicitation requires only that offerors bid in terms of DPLH by labor category. It does not specify the number of employees. Nor does it state that the work must be performed by full-time employees. AR at 2–5. In addition, attachment 3 to the solicitation calls for bidding in terms of *hours,* not in terms of *number of employees.* AR at 119 n. 2 ("Offerors are to propose the *required yearly DPLH* by labor category as listed. above.").

Reading the solicitation as a whole, the court concludes that it unambiguously required bidding in DPLH, not in number of employees. In addition, the solicitation did not prohibit the use of part-time employees. Even if the provision discussed created an ambiguity, such ambiguity, if any, was patent, thus allocating the duty of inquiry to plaintiff. *See Community Heating,* 987 F.2d at 1579 (Fed.Cir.1993). Plaintiff made no inquiry as to this provision. However, the court finds no ambiguity, thus finding that the solicitation required the provision of 62,-000 DPLH per year only, and allowed bidders to determine how to allocate the required hours among at least the minimum number of employees set out in each labor category.

### Past Performance

■ Plaintiff also contends that DOE unlawfully evaluated its past performance. By statute, agencies must rate offerors' past performance. *See* 41 U.S.C. § 405(j). There are three categories of past performance information. The first category is agency "past performance evaluations," generated after contract performance is complete. *See* FAR § 42.1502(a).[11] The second category is agency "interim evaluations," for contracts not fully performed. *See id.* These evaluations are voluntary. However, if "interim

evaluations" are prepared, they must be shared with other agencies. *See* FAR § 42.1503(c). The third category is *"ad hoc* past performance information," obtained by "afford[ing] offerors the opportunity to identify Federal, state, and local government, and private contracts performed by the offerors that were similar in nature to the contract being evaluated," thereby allowing the agency to verify offerors' past performance on those contracts. FAR § 15.608(a)(2)(ii).

Plaintiff concedes the lack of "past performance evaluations"—the first category. Plaintiff claims, however, that DOE ignored several "interim evaluations:" three from DOE's Oakland Office and one from DOE's Albuquerque Office. AR at 2217–79. However, it appears that the proffered "interim evaluations" were not presented to DOE as part of plaintiff's bid. Nor did these evaluations comply with DOE's guidelines. For example, they were not on DOE's required form, which contains a specific rating scale. AR at 2198. In sum, the evaluations plaintiff proffers are not "interim evaluations" under the FAR. AR at 2187. Accordingly, it is evident that DOE did not violate the FAR requirement to share "interim evaluations," because none existed.

As for *ad hoc* past performance evaluations, DOE sent requests for such reports to all three of plaintiff's references. AR at 2008–11. None returned the questionnaire and the category was given a neutral rating as the solicitation mandated: "[I]f an offeror's client is unwilling to provide the Government requested information in support of the Government's past performance evaluation, that experience will be given a neutral rating." AR at 89–90; *see also* FAR § 15.608(a)(2)(iii).[12]

Moreover, even if DOE wrongfully failed to take into account plaintiff's past performance, plaintiff was not prejudiced thereby, because plaintiff's "interim evaluations" evidenced less than favorable performance, containing [***]. AR at 2265, 2268, and 2275.[13]

---

11. Such evaluations are required for all contracts exceeding $1,000,000, effective July 1, 1995, and all contracts exceeding $100,000, effective January 1, 1998.

12. Neither the FAR nor the solicitation specified the numerical value of a "neutral" rating. DOE applied a rating of "good," equivalent to a numerical score of 8 out of 10.

13. Plaintiff's performance under the categories

Therefore even if these negative evaluations had been presented, it is unlikely that plaintiff would have achieved a rating of "10" (the numerical rating scale was 0, 2, 5, 8, and 10, AR at 176).

By contrast, DynMeridian's past performance questionnaires gave it the [***], except for a questionnaire that included [***]. Despite these overall [***] ratings ( [***]), DynMeridian received a score of only [***] for past performance, AR at 166–71, the [***] given plaintiff. We must assume that even with little or no criticism, plaintiff too would have earned no more than an "8."

Finally, even if plaintiff had received a perfect score of "10" for past performance, it would not have been selected for award. That is because a perfect score in this category would have given plaintiff only 50 extra points, thus raising its total technical score to 761.6 only, and thus 27% lower than Dyn-Meridian's technical score. Again, this difference is particularly significant in light of the solicitation's emphasis on technical factors over price, AR at 108, and, in any event, outweighs plaintiff's 26% cost advantage.

### Meaningful Discussions

 Plaintiff alleges that DOE failed to conduct the "meaningful discussions" required in negotiated procurements. "Meaningful discussions" must "[a]dvise the offeror of deficiencies in its proposal so that the offeror is given an opportunity to satisfy the Government's requirements." FAR § 15.610(c)(3). Case law provides that discussions are meaningful if they "generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit." *SRS Techs.*, B–254425.2, Sept. 14, 1995, 94–2 CPD ¶ 125, at 6; *see generally Navales Enters.*, B–276122, May 13, 1997, 97–1 CPD ¶ 203. The contracting officer has broad discretion in conducting discussions. *See* FAR § 15.610(b) ("[t]he content and extent of the discussions is a matter of the contracting officer's judgment, based on the particular facts of each acquisition"); *Burroughs Corp.*

*v. United States*, 223 Ct.Cl. 53, 617 F.2d 590, 598 (1980) (same).

Plaintiff's claim that the discussions failed to address the senior technical analyst's lack of nuclear weapons design, development, or testing experience is baffling since the record shows that DOE addressed the matter no less than three times. DOE addressed the issue (1) in plaintiff's initial evaluation, AR at 182 ("Proposed Sr. Technical Analyst's technical experience is limited.... No demonstrated expertise in weapons design, development, or testing."); (2) in plaintiff's debriefing, AR at 203 ("No expertise in weapons design."); and (3) in the discussion questions, AR at 228–29 ("Please explain how the ADC team adequately covers all of these four technical areas [including nuclear weapons design, development, and testing]. In addition, demonstrate that your proposed senior technical analyst has the expertise in at least two of the four areas.").

Plaintiff's second claim, that it was not informed that its technical approach appeared to be oriented toward large project management, as opposed to day-to-day support, is equally unmerited. One of the questions asked for a discussion of "how your team would provide daily support and respond to short-term deadlines." DOE felt that plaintiff's answer to this question demonstrated an inability to respond to short term deadlines. Specifically, DOE noted that plaintiff's answer "showed a number of procedural steps needed before [plaintiff] would begin work on a 'quick response' item." See Def.Br. at 28; *see also* AR at 1843 (showing the number of steps required to respond to emergencies). The technical evaluation also communicated this deficiency: "[ADC][a]ppeared to be oriented to a large project management approach as opposed to an integrated day-to-day support." AR at 241. Plaintiff claims that the discussions failed to reveal that this was a concern. On the contrary, the discussion question did precisely that. The technical evaluation's criticism of plaintiff's "large project management approach" indicated plaintiff's prior failure to

of "quality of products/services," "timeliness of services," and "ability to meet task requirements

with little or no interruptions in service," was rated as [***].

address the discussion question, not an independent weakness in plaintiff's proposal.

■ In addition, contrary to plaintiff's contentions, DOE was not required to inform plaintiff that DOE never received plaintiff's *ad hoc* performance evaluations. FAR § 15.610(c)(2) requires only that discussions advise "the offeror of *deficiencies* in its proposal." (emphasis added). Because plaintiff received a neutral rating in this category, there was no deficiency, and thus no discussions were required. AR at 89–90. Nor was this a mistake requiring discussion. *See* FAR § 15.610(c)(4) (discussions shall "[r]esolve any suspected mistakes"). Rather, this eventuality was explicitly contemplated by the solicitation. AR at 89–90 (offerors lacking past performance information receive a neutral rating).

■ Finally, DOE's discussion questions regarding CRIT, CNWDI, and restricted data were not misleading. DOE was concerned that plaintiff's proposal confused these concepts. The debriefing, AR at 203, and the discussion questions, AR at 229–30, both raised this concern. Nevertheless, plaintiff's discussion answers demonstrated continuing confusion of these concepts, thereby confirming DOE's concerns. DOE was not required to explain to plaintiff that plaintiff fundamentally misunderstood concepts used in the Office of Declassification, but only to give plaintiff a reasonable opportunity to correct its errors. The mere fact that the plaintiff's *response* failed to satisfy the evaluators does not mean that the *discussions* were inadequate. *See generally Reflections Training Sys., Inc.*, B–261224, Aug. 30, 1995, 95–2 CPD ¶ 95.

### *CNWDI Reference*

Finally, plaintiff's claim that defendant failed to assess plaintiff's revised proposal when it did not notice that plaintiff had deleted reference to CNWDI rests on an incorrect factual premise—plaintiff did *not* delete reference to CNWDI in its BAFO. AR at 1828. Indeed, this answer demonstrated plaintiff's continued confusion regarding CNWDI's role, or lack thereof, in DOE's Office of Declassification.

### *Conclusion*

Plaintiff's motion for summary judgment is denied and defendant's cross-motion for summary judgment is granted. The Clerk of the Court shall enter judgment for defendant.[14]

---

14. The court has considered plaintiff's claim that DOE breached its implied duty to fairly consider plaintiff's bid. This theory of relief requires proof that the government's actions were arbitrary and capricious. *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 447 (Fed.Cir.1996). In light of the court's finding that DOE's procurement decisions were reasonable, and absent any independent evidence of arbitrary or capricious decision making, this claim must also fail. Nothing in the record supports an independent claim for bad faith, particularly in light of the onerous burden for plaintiffs to prove governmental bad faith. *See Torncello*, 681 F.2d at 771.