**OMEGA WORLD TRAVEL, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**CW Government Travel, Inc., d/b/a Carlson Wagonlit Travel, Intervenor.**

**No. 02–1199C.**

United States Court of Federal Claims.

Nov. 26, 2002.

Barry Roberts, of Washington, D.C. for plaintiff.

Colleen Hanrahan, Commercial Litigation Branch, Civil Division of the United States Department of Justice for defendant.

J. Scott Hommer, III, of McLean, Virginia for intervenor.

## OPINION

BRUGGINK, Judge.

This post-award bid protest stems from a request for proposal ("RFP") issued by the Military Traffic Management Command, Department of the Army ("MTMC") issued on May 3, 2001 for travel services for Army personnel. The contract was awarded to Carlson Wagonlit Government Travel ("Carlson"). Scheduled Airlines Traffic Office ("Sato") and plaintiff Omega World Travel ("Omega") brought bid protests in the United States General Accounting Office ("GAO") on April 19 and April 12, 2001, respectively. After clarification from the Contracting Officer, plaintiff resubmitted its bid protest on May 15, 2002. On August 21, 2002 GAO issued a decision denying all protests. Plaintiff filed this action on September 12, 2002. Carlson intervened on September 24, 2002.

The narrow question posed is whether Omega has demonstrated that the government's conduct in awarding the contract to Carlson was arbitrary, capricious, an abuse of discretion or otherwise contrary to law. Pending are the parties' cross-motions for judgment on the administrative record. Oral argument was held on Thursday, November 7, 2002. For reasons explained at the conclusion of oral argument and set out below, plaintiff's motion is denied and defendant's motion for judgment on the administrative record is granted.

## FACTS

On May 3, 2001 [1] the MTMC issued RFP Solicitation Number DAMT01–01–R–0175 seeking proposals for commercial travel services for the Department of the Army.[2] The RFP covered official and leisure travel for the Department of Defense ("DoD") personnel and Army. Carlson was the incumbent under the previous contract for travel services. The Solicitation requested proposals for travel services covering five geographic regions. The contract was for a base period of one year, followed by eight six month option periods for each region. The RFP provided that award would be "based on the best overall value to the government," considering the evaluation factors cited in the Solicitation. A.R. at 1042.

The RFP indicated that an offeror could "propose on any or all of Regions shown in the schedule." Administrative Record "AR" at 0576. However, if a contractor wished to submit a proposal for all five regions, the contractors were advised that they could "submit either a separate proposal for each region, or one proposal ... and ... tailor the proposal for each region." AR. at 3121. The MTMC indicated that it "contemplate[d] the award of multiple Firm–Fixed–Price Contract(s) resulting from [the] Solicitation." AR. at 0576. The proposal indicated that a maximum of five contracts would be awarded, but did not fix any minimum number.

The Solicitation established ninety Contract Line Item Numbers ("CLINs"). Each region had CLINs for traditional travel and on-line booking. Sub–CLINs for air/rail official travel, non air official travel service, and emergency leave were incorporated within on-line booking. Usage data for each region was given by each location with that region. Travel volume and requirements, as well as floor space available to the contractor in each location, were included within the usage data. MTMC indicated that the information was a rough estimate, as some locations did not report statistics in these areas. Amendment Thirteen identified the potential problem with the usage estimates: "a significant number of the non-air transactions listed in the technical exhibits and the non-air CLINs are included in the air/rail transactions technical exhibits and CLINs." AR. at 1055c. The Amendment also informed the offerors that

---

1. The RFP was substituted by a fully amended RFP on May 11, 2001. AR. at 0602.

2. The Solicitation was amended thirteen times. AR. at 0602–1585.

"[t]he quantities listed in the pricing section of the Solicitation are for evaluation purposes only." *Id.* Offerors then provided pricing data by multiplying the estimated travel volume by the offeror's price.

The RFP enumerated three non-price evaluation factors and one price factor in descending order of importance:

Factor 1—Acceptability/Capability

Subfactor (a) Understanding of the Work (Traditional Travel Service)

Subfactor (b) Understanding of the Work (On-line Booking Engine)

Factor 2—Participation of Small and Small Disadvantaged Business Concerns

Factor 3—Past Performance

Factor 4—Transaction Fees

The non-price factors were "significantly more important than Transaction Fees (Factor 4)." AR. at 1040.

MTMC provided extensive definitions for the two subfactors within the Acceptability/Capability factor. Traditional travel services, for example, encompassed an offeror's overall approach to making travel arrangements. This sub-factor addressed the effectiveness of offeror's reservation procedures, methodology for delivering tickets, customer service, and routine service levels expected throughout the contract. The second subfactor, on-line booking, would be evaluated on the ability to provide real time booking, and to accept payments from a variety of payment forms. Additionally, the evaluation would focus on the on-line system's ability to contain DoD and other government travel policies. MTMC made it clear that the usage of an on-line booking system would not be mandatory for Army personnel.

Participation of small business and small disadvantaged business concerns was to be outlined in a narrative no longer than five pages. This narrative was in addition to the offeror's small business subcontracting plan. Past performance was assessed on an evaluation sheet including information from customers and other government agencies.

MTMC held a pre-proposal conference on May 31, 2001. Representatives from Carl-son, Sato, and Omega, along with others, were present. MTMC addressed the topic of multiple award pricing discounts: "[t]here is nothing in the RFP that prohibits this type of pricing submission provided that the offeror complies with the requirement to price each SUBCLIN within a CLIN." AR. at 3162, 3629. When questioned as to the number of potential contractors, MTMC was clear that "multiple awards may be made to one or more offerors." AR. at 3159. MTMC reiterated that performance-based factors, not cost, were the most significant.

Carlson, Sato, and Omega submitted proposals by the deadline of October 22, 2001. All three were considered within the competitive range. Discussions were held with each of the three offerors, after which, they submitted proposal revisions.

Omega included within its proposal what it styled an on-line booking discount. The proposal stated:

Once the Army reaches 10% online usage, Omega will reduce the transaction fee for online bookings to $8.00. This will be evaluated quarterly and the reduced transaction fee will go into effect for the successive quarter. As long as online booking tool usage remains at or above 10%, the $8.00 transaction fee will apply.

In addition, Omega proposed consolidation pricing discounts. These pricing discounts were triggered if MTMC agreed to consolidate smaller offices into larger ones. Additionally, Omega offered a discount if a certain percentage of all travel volume was handled by their centralized call-centers. Omega, however, did not address the impact that these consolidations would have on service nor did it specify how the option would affect overall cost.

Omega was given an overall rating of good for all three evaluation factors outlined in the RFP. Sato was rated excellent for factors one and three, and good for factor two.[3] Carlson was rated excellent for all three factors.

MTMC conducted a price analysis, which included a matrix for all offerors' proposed prices, including any alternate proposals, for

---

3. Sato's rating changed to excellent after clarification of factor two. AR. at 3313.

each region. Although Omega was the lowest price offeror in two of the five regions, it was not deemed "technically competitive" with Sato and Carlson. AR. at 0091, 3311, 3314, 3455. MTMC determined that Sato and Carlson were essentially technically equivalent. MTMC indicated that the deciding factor between these two offerors was price. Carlson's bid was approximately $4 million less than Sato (and $1 million less than Omega). The contract was awarded to Carlson on February 27, 2002. Omega received a requested debriefing on March 8, 2002. Sato filed an agency protest on March 8, 2002 and later a GAO bid protest on March 11, 2002. Omega filed an agency protest on March 12, 2002.

During these protests, MTMC discovered that Sato and Carlson had exceeded the maximum page limitations for their small business and small disadvantaged business concerns narratives. In addition, Omega had failed to provide the requisite five page narrative in addition to its subcontracting plan. On April 8, 2002, MTMC decided to take corrective action in order to "eliminate any doubts concerning the reasonableness of [the small business narrative portion] of the evaluation and the resulting source selection." AR. at 2773, 3313. GAO dismissed Sato's protest the same day. After further clarifications by MTMC the revised narratives were due May 2, 2002. Carlson and Sato provided a five page narrative in addition to their initial subcontracting plan. Omega resubmitted its original plan without an additional narrative.[4]

On April 12, 2002, Sato requested that the GAO reinstate its bid protest. Omega filed a bid protest with GAO on April 19, 2002. On May 9, 2002, the Contracting Officer issued an addendum to the source selection decision statement. The addendum informed the offerors that after the corrective action Carlson and Sato remained technically equivalent. Omega remained technically inferior to the other two proposals. In addition, Carlson

was approximately $4.6 million less expensive than Sato, and more than $1 million cheaper than Omega.[5] On this basis, the Contracting Officer once again chose Carlson as the best overall value. On May 15, 2002, Omega reinstituted its bid protest to GAO, which the GAO denied on August 21, 2002. Thereafter this action was filed on September 12, 2002.

## DISCUSSION

■ Under the Administrative Dispute Resolution Act, this court has "jurisdiction to render judgment on an action by an interested party objecting to ... any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). MTMC's actions may be held unlawful or set aside if this court finds they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Further, plaintiff "must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir.1996). Our review is on the record as it was developed before the contracting agency, here MTMC. *WorldTravelService v. United States,* 49 Fed.Cl. 431, 438 (2001) (citing *Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 342 (1997)). These motions for judgment upon the administrative record are brought under Rule 56.1.

### Reopening the Request

■ At the outset the court must consider whether the RFP was improperly reopened. Contracting officers are entitled to broad discretion to take corrective action if they determine "that such action is necessary to ensure fair and impartial competition." *DGS Contract Serv., Inc. v. United States,* 43 Fed. Cl. 227, 238 (1999). Where a contracting officer's actions are "reasonable under the

---

4. The only substantive change which occurred as a result of the corrective action was that Sato was given a rating of excellent for Factor Two. AR. at 3313.

5. After all appropriate discounts were taken into consideration, Sato's proposal for transaction fees was $132,950,393, Omega's was $129,358,939, and Carlson's proposal for transaction fees was $128,323,554. AR. at 3282.

circumstances" they will not be determined contrary to law. *Id.*

■ Omega alleges that only Carlson and Sato had failed to abide by the terms of the RFP—submitting a narrative outlining their Small Business sub-contracting plans. Omega is correct insofar as it alleges that Carlson and Sato failed to stay within the prescribed five page limit for the required Small Business subcontracting narrative. However, all three offerors failed to meet the requirements of the RFP. Plaintiff submitted only a five page sub-contracting plan, without an additional narrative.[6] Absent re-opening the RFP, MTMC would have been left with no compliant offerors. We agree with the GAO that the contracting officer's actions to allow the re-opening of the RFP were reasonable.

*Carlson's Advantage as Incumbent*

Each offeror was required to bid a transaction fee and multiply this price by the estimated volume given for each location in a particular geographic region. Omega alleges that MTMC was arbitrary and capricious in evaluating the price proposals of Omega and Carlson, in that it knew "that Carlson was able to offer a lower price because as the incumbent it had actual knowledge of the non-air service numbers and used those actual numbers in preparing its proposal ..." Pl. Mtn. at 19. Omega's allegation is that the agency's estimated volume was not only inaccurate, but that MTMC knew these numbers were inaccurate. Further, Omega argues that MTMC knew Carlson was aware of correct figures, and did nothing to provide offerors with accurate information.

■ Omega's contentions fail for two reasons. First, even if the numbers were inaccurate, as Omega contends, the mechanism of evaluating the offers equalized Omega and Carlson. MTMC evaluated the RFP price based on the transaction fee multiplied by the estimated usage. Every offeror was evaluated on the same number of transactions. Both Carlson and Omega were requested to bid on a particular number of

transactions, which each did. Omega's argument, then, must rest on the assertion that Carlson's knowledge of potential economies of scale allowed it to bid a lower transaction fee based on its own costs. An agency, however, is not obligated to equalize all other offerors with an incumbent. *Computer Sciences Corp. v. United States,* 51 Fed.Cl. 297, 311 (2002). Instead, the natural advantage that an incumbent may have is permissible. Here, if Carlson had any knowledge of accurate numbers, these numbers would have aided only in Carlson's estimation of a transaction fee. MTMC considered all offerors on the same number of transactions and so did nothing impermissible.

■ Second, MTMC made it clear to all offerors that the numbers for travel usage were only estimates. During a telephone conference on December 4, MTMC discussed the nature of the travel data usage numbers. MTMC stated that "quantities listed in the pricing section of the Solicitation are for evaluation purposes only." AR. at 1055c. MTMC explained that some of the numbers included within the non-air sub-CLINs should have been under the heading of air/rail. MTMC was also clear that it had provided offerors with the best information available to it at that time. Importantly, Omega does not allege that the government withheld more accurate data. MTMC needed only to provide the most accurate data available to it at the time. Even assuming Carlson had more precise data, it is not the duty of the government to provide data in the hands of the incumbent. MTMC's provision of and subsequent reliance on estimates of travel usage was not arbitrary or capricious.

*Contingent Discounts*

■ Plaintiff alleges that MTMC improperly failed to consider Omega's discounts for on-line booking and consolidation. MTMC determined that plaintiff's on-line booking discount was contingent and so could not be considered in the decision to award the RFP. Plaintiff offered a 20% discount for on-line

---

**6.** The page limit for the sub-contracting plan was 200 pages, significantly in excess of the five page narrative. AR. at 1039, FAR § 19.704 (outlining the detailed requirements for a sub-contracting plan).

bookings, so long as the bookings were 10% of MTMC's total bookings. Essentially, Omega contends that because the Army can order travelers to use the on-line booking system, the discount was not contingent.[7]

The Army had a practice of making on-line booking optional. At the preproposal conference, the Army made it clear that would not make on-line booking mandatory. Each installation would be allowed to determine whether to utilize the on-line booking system. The offerors were put on notice of standard Army procedure with respect to on-line booking. Prior to this solicitation, the Army had not kept a record of on-line usage and did not have any means of determining at what level on-line booking would be used. Plaintiff's discount could only be utilized if MTMC could ensure that 10% of the travel bookings were done online. We see no error in the agency's treatment of the discount as contingent. See Assets Recovery Systems, Inc., B–275332, 97–1 CPD ¶ 67, 1997 WL 51481 (Comp.Gen. Feb. 10, 1997) (contingent offers may not be considered in award decisions).

Omega also argues that its on-line discount was not contingent because MTMC had made on-line booking an important factor in bid evaluation. Such an argument conflates the technical requirements of an on-line booking system with the projected use of an on-line booking system. Only the technical requirements of an on-line booking system were a factor in bid evaluation. MTMC was therefore neither arbitrary nor capricious when it did not consider Omega's online booking discount.

 Plaintiff also offered what it styled a facility consolidation discount. The consolidation discounts were actually two separate proposed discounts, each dependent on future contingencies. In the first, Omega identified some of the sites in each regional area which it determined would be appropriate for consolidation. The consolidation proposal was dependent on later negotiations between Omega and defendant over which other offices which could be consolidated.

Plaintiff offered a second consolidation discount, based on the percentage of air travel volume moved to one of Omega's call centers from an existing government location. Much like Omega's on-line discount, this discount was contingent on future events over which MTMC had no real control. The percentage of travel volume which may be processed through a particular center is contingent on the decision of individual users and the travel needs in each particular region. MTMC's failure to consider these discounts was therefore not arbitrary and capricious.

 Omega also objects to MTMC's asserted lack of discussion about its discounts. Plaintiff rightly states that the Federal Acquisition Regulations § 15.306(d)(3) requires that a

> contracting officer discuss ... deficiencies, significant weaknesses, and adverse past performance and other aspects of its proposal ... The contracting officer also is encouraged to discuss other aspects of the offeror's proposal that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award.

48 C.F.R. § 15.306 (2002). The contracting officer, however, has broad discretion over the scope and nature of discussions. CACI Field Servs. v. United States, 13 Cl.Ct. 718, 734 (1987). Meaningful discussion must "generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit." Advanced Data Concepts v. United States, 43 Fed.Cl. 410, 422 (1999) (quoting SRS Techs., B–254425.2, Sept. 14, 1995, 94–2 CPD ¶ 125, at 6, 1994 WL 576118). Areas which require amplification or correction are those which either fail to meet the solicitation requirements or are in error. Labat–Anderson, Inc. v. United States, 42 Fed.Cl. 806, 835 (1999). Plaintiff's discount fits neither description. The contingent offers were clear, with no facial errors. Yet discussion would not have made the discounts less contingent. Further, Omega's

7. Omega argues that this "is the same Army that tells soldiers how to brush their teeth and tie their shoes."

proposal was not out of compliance with the solicitation requirements by proposing contingent discounts. Defendant was therefore under no obligation to have discussions with plaintiff about these discounts.

*Single Award to Carlson*

■ Plaintiff argues that MTMC's award to Carlson of all five regional contracts was arbitrary and capricious. Omega argues that, because the RFP contemplated an award to more than one offeror, MTMC's award to only one offeror was improper. Plaintiff also contends that MTMC improperly considered Carlson's multiple award discounts in making the award of all regional contracts to Carlson. Omega reasons that MTMC should have analyzed the proposals for each region separately and that if MTMC had done so, Omega would have been the lowest price offeror for at least two regions.

■ The court may find MTMC's actions unlawful only if the RFP mandated multiple awards.[8] It did not. The RFP stated that it was the government's intent to maximize the opportunity of offerors to participate, contemplating a maximum of five contracts to be awarded. Offerors were instructed that they could "propose on any or all of the Regions shown in the schedule." *Id.* Although multiple awards were "certainly suggested" by the Solicitation, Omega concedes they were "not mandated." Pl. Br. at 10. Indeed, plaintiff concedes the award of five separate contracts was not "specifically identified as an 'evaluation factor.'" Pl. Br. 21. Where an RFP does not require multiple awards, an Agency is under no obligation to award to multiple offerors. *See* FAR § 52.212–1(e), (h) (encouraging offerors to submit multiple offers and allowing the government to award any group to an offeror unless specific limitation in solicitation). Where an agency may award a single contract, evaluating the proposals on a single evaluation is permissible. *See Crofton Diving Corp.,* B–289271, Jan. 30, 2002, 2002 CPD ¶ 32 at 7, 2002 WL 221372.

In this instance, MTMC made a single evaluation with respect to the non-price factors. Each offeror received one overall evaluation for each of the three non-price factors and was rated on a scale from unsatisfactory to excellent. A single, overall technical evaluation could not have been a surprise to any offeror. The RFP required only one technical proposal, irrespective of the number of regions upon which an offeror bid. Additionally, the Solicitation required only one explanation of the offerors' acceptability/capability and experience/past performance. The description of the contents of the proposal and written capability materials made no mention of a requirement for separate regional materials.

Any confusion as to how MTMC would evaluate the proposals was removed during questions posed to the agency by the offerors. In response to a request for clarification, MTMC informed offerors that they may "submit either a separate proposal for each region, or one proposal ... and ... tailor the proposal for each region." AR. at 3121. During the pre-proposal conference, MTMC made it clear that only one technical proposal was required. In fact, Omega itself only provided a single technical proposal for all five regions.[9] In its own proposal, Plaintiff highlighted its overarching staffing capabilities for all regions: "[o]verall, we will provide one travel consultant for each $1,000,000 in official annual airline volume dedicated exclusive to the DoD/Army contract, depending on the complexity of the travel services required ...." AR. at 2692.

■ Nor was MTMC's consideration of Carlson's multiple award discount impermissible. Carlson proposed a separate pricing schedule in the event it was awarded all five regions. The offerors were made aware that this sort of alternative pricing was acceptable under the RFP. At the pre-proposal conference, MTMC was specifically asked about multiple award pricing discounts. Defendant

---

8. The intervenor properly notes that this is a technical impossibility. At least one offeror had to win more than one regional contract, as there were five regions and only three offerors.

9. Plaintiff did delineate between regions where necessary, as in their staffing plan. However, overall technical capabilities, such as emergency services were only addressed once in an all-inclusive manner. *See, e.g.,* AR. at 2679.

remarked that "[t]here is nothing in the RFP that prohibits this type of pricing submission provided that the offeror complies with the requirement to price each Sub-CLIN." AR. at 3162.

*Was the Agency's Award Analysis Arbitrary or Capricious?*

 In a negotiated procurement the protestor's burden of proof is higher than other forms of bid-protest. *Mangi Envtl. Group, Inc. v. United States*, 47 Fed.Cl. 10, 15 (2000). The higher burden exists because the contracting officer engages in what is "an inherently judgmental process." *Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 65, 617 F.2d 590 (1980). There is disagreement among the parties as to whether the contract was awarded based on price alone or on price in conjunction with technical quality because the contracting office was not always precise in language. In this case, however, the outcome is the same, therefore, plaintiff fails to carry its burden.

MTMC was reasonable in its decision to award all five contracts to Carlson based upon price alone. The Solicitation clearly indicated that it would be awarded "based on the best overall value to MTMC considering the evaluation factors cited in this Solicitation." AR. at 1042. Even assuming that plaintiff is correct in its often repeated interpretation of MTMC's statement "the real discriminator between the proposals was the proposed Transaction Fees," i.e., that price was the sole determinant, defendant was not arbitrary in its award to Carlson.[10]

As discussed above, Carlson's multiple award price discount was properly consid- ered by MTMC. Based on its multiple award discount, Carlson was the lowest price bidder by approximately one million dollars. In order for defendant to exercise this discount, MTMC had to award all five contracts to Carlson. MTMC considered all possible award combinations, in order to determine which would give the lowest overall price. Thus, Omega's lower prices in only two regions were not the best value to MTMC overall.

Even if Omega had been the overall lowest price offeror, MTMC was not obligated to make an award to plaintiff. Omega argues that it was "the lowest price technically acceptable offeror for at least two regions." AR. at 98, 120. Thus, plaintiff argues, it should have been awarded the contracts for those two regions. Omega misinterprets the nature of this solicitation. The RFP was awarded on the best value for defendant overall. The solicitation is clear that the non-technical factors were "significantly more important" than price factors. *Id.* It is well settled that contracting officers are given broad discretion with respect to evaluation of technical proposals. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir. 1996).[11] This court will not, therefore, second guess the technical ratings that the source selection committee gave to each offeror.

Plaintiff was rated "good" with respect to all three non-price evaluation factors. Both Carlson and Sato were evaluated as excellent for the same three factors. The Contracting Officer's Source Selection Decision Statement clarifies that Omega "was rated lower

10. The whole of this quote reads: "All proposals were evaluated in accordance with the evaluation factors set forth in the RFP. As a result of the evaluation, CWGT [Carlson] and SatoTravel [Sato] were rated excellent and deemed to be essentially equal technically whereas Omega was rated an overall good. Given that fact, it was concluded the real discriminator between the proposals was the proposed Transaction Fees." AR. at 3467. The most natural reading of this passage is that the only discriminator between Carlson and Sato, the technically equivalent offerors, was price.

11. In its complaint plaintiff alleged that Carlson's past performance was improperly weighed.

Plaintiff alluded to similar arguments in its brief. Pl. Br. at 7, n. 6. Carlson was given a rating of "excellent" for past performance. Plaintiff alleges that this rating was improper due to an earlier default by Carlson. The use of the word "default" by plaintiff is imprecise, misunderstanding both the nature of default and the disagreement between Carlson and the government. Carlson and the government had a dispute over a contract adjustment for fees. The government did not initiate a cure notice, much less termination for default. 49 C.F.R. § 52.249–8. The rating of excellent for past performance was therefore not arbitrary and capricious.

overall and not competitive with SatoTravel and [Carlson's] excellent proposals." AR. at 3311. This statement is strengthened in an Addendum to the Source Selection Decision Statement, as the Contracting Officer states that "Omega continues to be technically inferior to both [Carlson] and SatoTravel and its overall prices remain higher than [Carlson's]." AR. at 3314. Because the RFP indicated that the non-price factors were significantly more important than the price factor, MTMC was not arbitrary and capricious in awarding all five regions to Carlson.

## CONCLUSION

Plaintiff's motion for judgment on the administrative record is denied. Defendant's cross-motion for judgment on the administrative record is granted. The complaint is thus due to be dismissed. Judgment is directed accordingly. No costs.